IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LINDA D. OLDAKER,

        Plaintiff,

      v.                          Civil Action No. 5:08-CV-109

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

      Plaintiff, Linda Oldaker, (Claimant), filed a Complaint on June 25, 2008 seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on December 19, 2008.[2]  Claimant filed her Motion for Summary Judgment on January 16, 2009.[3]  Commissioner filed his Motion for Summary Judgment on March 6, 2009.[4]  Claimant filed a Response to Commissioner's Motion on March 20, 2009.[5]

---

[1] Docket No. 1.

[2] Docket No. 11.

[3] Docket No. 14.

[4] Docket No. 17.

[5] Docket No. 19.

B.      The Pleadings

    1.      Claimant's Brief in Support of Motion for Summary Judgment.

    2.      Defendant's Brief in Support of Motion for Summary Judgment.

    3.      Claimant's Response to Defendant's Motion for Summary Judgment.

C.      Recommendation

    I recommend that:

    1.      Claimant's Motion for Summary Judgment be **DENIED**.  Substantial evidence supported the ALJ's finding that Claimant failed to meet Listing 12.05(c) because Claimant failed to meet each element of the listing, specifically, substantial evidence supported the ALJ's finding that subaverage intellectual functioning did not manifest prior to Claimant reaching age 22.  Furthermore, the ALJ properly considered the opinions of all Claimant's treating sources and finally, the ALJ made a proper RFC finding.

    2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.      Procedural History

    Claimant filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits on February 2, 2005, alleging an onset of disability of July 4, 2004 (Tr. 58), due to a back injury .  (Tr. 149).  The claims were denied initially on April 22, 2005 (Tr. 37-43).  Thereafter, on May 10, 2005, Claimant filed a Request for Reconsideration. (Tr. 44).  The claims were denied upon reconsideration on September 26, 2005 (Tr. 45-47). Claimant filed a written request for a hearing on October 4, 2005 (Tr. 48).  Claimant's request

was granted and a hearing was held on September 26, 2006 (Tr. 49, 396-439 ).

The ALJ issued an unfavorable decision on November 24, 2006 (Tr. 20-30). On December 5, 2006, Claimant filed a request for review of that determination. (Tr. 18). The request for review was denied by the Appeals Council on June 11, 2008 (Tr. 7-13). Therefore, on September June 11, 2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on January 17, 1971 and was thirty-three (33) years old as of the onset date of her alleged disability and thirty-five (35) as of the date of the ALJ's decision. (Tr. 58). Claimant was therefore considered a "younger person" under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008). Claimant completed tenth grade and attended special education classes. (Tr. 77). Claimant has prior work experience as a housekeeper. (Tr. 73).

C.    Medical History

The following medical history is relevant to the sole issue pertinent to the disposition of this case, specifically, Claimant's mental impairment(s):

**West Virginia DDS, Mental Assessment, Morgan D. Morgan, M.A., 4/5/05 (Tr. 189-195)**

Morgan Morgan completed the following assessments:
1.    WAIS-III
2.    WRAT-3
3.    Mental Status Examination
4.    Clinical Interview

Mr. Morgan found Claimant to be appropriately dressed and groomed for her appointment. She drove herself to the appointment and supplied the information for the assessment.

Claimant's chief complaint was "a lumbar sprain with herniated discs."

Claimant stated that she had been suffering from "mild depression" since she stopped working in July 2004 and that these mood symptoms are attributable to not being able to work and being home alone.

Mental Treatment History - Claimant has no past admissions to psychiatric hospitals and has not received outpatient psychiatric services.

Developmental and Social - Claimant had a "dysfunctional" childhood. The family moved about throughout West Virginia. Her parents had both abused alcohol. She reported being sexually abused by a cousin until she was 16 years old.

Mental Status Examination - Claimant did not display symptoms of psychosis and her thoughts were organized. She did not display signs or symptoms of suicidal or homicidal ideation.

WAIS-III:

| Verbal Subtests | | Performance Subtests | |
|---|---|---|---|
| Vocabulary | 5 | Picture Completion | 8 |
| Similarities | 5 | Digit Symbol | 9 |
| Arithmetic | 6 | Block Design | 5 |
| Digit Span | 7 | Matrix Reasoning | 7 |
| Information | 6 | Digit Symbol Coding | 6 |
| Comprehension | 6 | Mean | 7.6 |
| Mean | 5.83 | | |

| | |
|---|---|
| Verbal IQ | 75 |
| Performance IQ | 81 |
| Full Scale IQ | 76 |
| Verbal Comprehension | 74 |
| Perceptual Organization | 80 |

WRAT-3:

| Subject | Standard Score | Grade Score |
|---|---|---|
| Reading | 75 | 5 |
| Spelling | 69 | 4 |
| Arithmetic | 88 | 7 |

Subjective Symptoms - Claimant reported suffering from "mild depression" beginning in July, 2004. She attributed it to her back injury and not being able to work and being home alone.

Objective Symptoms - She is generally functioning within the Borderline Intellectual Functioning range of intelligence.

Diagnostic Impressions:
Axis I          309.0          Adjustment Disorder with depressed mood
Axis II         V62.89         Borderline intellectual functioning
Axis III        Reported back pain, lumbar sprain, herniated disc, and history of heart murmur

## **Mental RFC, Frank Roman, Ed.D, 4/13/05 (Tr. 196-199, 208-221)**

Dr. Roman completed a Mental RFC on April 13, 2005.  He found Claimant to be moderately limited in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods.

Dr. Roman found that her activities of daily living are limited by her lower back injury and that she can perform activities of daily living independently and follow routine repetitive work activities in a low stress work setting.

Dr. Roman also completed a Psychiatric Review Technique at this time.  He found Claimant to have mild limitations in her activities of daily living and mild difficulties in maintaining social functioning.  He found moderate difficulties in maintaining concentration, persistence or pace.  No history of psychiatric treatment was noted and Claimant stated she was "mildly depressed."

## **Psychological Exam, Joy Butcher-Winfree, M.S., 9/05-10/05, (Tr. 280-304)**

Claimant presents with symptoms of Posttraumatic stress as a result of childhood sexual abuse.

Ms. Butcher-Winfree reviewed the results of the standardized tests given by Mr. Morgan.  She found Claimant's overall ability to be in the average range.  Claimant's general level of intellectual ability was classified in the Extremely low range to Borderline range.  Ms. Butcher-Winfree opined that Claimant may find it difficult to make appropriate changes, solve problems, and utilize feedback in a changing environment.  She was diagnosed with PTSD.  She meets the diagnosis of Borderline Intellectual Functioning.

Diagnostic Impressions:
Axis I          309.81         PTSD with delayed onset
Axis II         V62.89         Borderline intellectual functioning
Axis III        Traumatic back injury
Axis IV         Problems with primary support group with occupational endeavor now with
                injury and economic problems
Axis V          GAF 50

Ms. Butcher-Winfree completed a Psychiatric Review Technique and found Claimant's restriction of Activities of Daily Living to be moderately limited.  She found a marked degree of limitation in difficulties in maintaining social functioning and maintaining concentration, persistence or pace.

**Total Life Clinicians, LLC, Greenbrier Almond, M.D. 10/05-7/06 (Tr. 334, 356)**

Dr. Almond wrote a letter to Claimant's attorney on July 22, 2006.  He diagnosed Claimant with Axis I - depression secondary to back pain.  Her global assessment of function is 50, which is in the serious range of debility.

Jean M. O'Halloran wrote to Claimant's attorney on July 21, 2006.  She stated they were "making progress."  She stated Claimant has many stressors in her life that exacerbate her pain, which in turn contributes to her depression.

Dr. Almond also saw Claimant from October to December, 2005.  On 12/20/05, Dr. Almond reported that Claimant was improving in her PTSD symptoms and is less anxious and depressed.

**Tri-County Health Clinic, 6/05-5/06 (Tr.  359-369)**

On April 18, 2006, Claimant followed up at the clinic for depression.  She stated she "has been doing well."  She felt as though Dr. Almond was helping her.  She denied any suicidal ideation.

**Total Life Clinicians, LLC, Jean M. O'Halloran, May 24, 2007 (Tr. 393)**

Ms. O'Halloran wrote to Claimant's attorney.  She stated they have been making progress.  Her diagnoses are depression, chronic, moderate and PTSD.  Ms. O'Halloran opined that Claimant is "truly disabled."

D.     Testimonial Evidence

      Testimony was taken at a hearing held on September 26, 2006.  The following portions of the testimony are relevant to the disposition of the case:

      ATTY      Yes Your Honor, very briefly.  What we see here, Your Honor, is basically a three-fold case.  We see that Ms. Oldaker has both psychological and physical impairments, and if I may address the psychological first.  Your Honor, first off, we contend that she meets listing 12.05C.  We see that thee are three sets of IQ scores in the record.  The first being at Exhibit 21F.  Those were, that was a psychological evaluation conducted in 1982 while Ms. Oldaker was in school.  The WISC-R was used as she was a child at the time.  Most importantly, it rendered a verbal score, IQ score of, in the range of 12.05C.  Then we come up to

the present, Your Honor, and we see two sets of IQ scores.  We see scores at Exhibit 13F, psychological evaluation by Joy Winfrey, one of her treating sources, and we also see psychological evaluation at Exhibit 4F, Mr. Morgan Morgan, a social security consultative evaluation.  Now what we see is the scores at Exhibit 13F, a verbal score basically one point different than the scores at Exhibit 21F and when we look across the board at the performance in the full scale, all of those scores all fall within one point so these scores, Your Honor, in effect are basically identical.  Now Your Honor, we see that at Exhibit 4F the scores are again very, very close except somehow Mr. Morgan's testing ended up with a verbal score approximately five points above the line of 12.05.

Now Your Honor, I don't know how Mr. Morgan particularly ended up with that testing and ended up with a score of five points above, but what we see, what we know is that the WAIS at that level has a standard deviation of five points, which would put us still back into the range of 12.05.  Now if we had one score alone, I wouldn't even make that standard deviation argument because I would say, well it could go either way.  We could be five points higher but we're not standing alone.  What we see is testing during her schooling and we further see testing currently in Exhibit 13F that is basically identical.  Mr. Morgan's test is the one that is standing outside of the IQ scores confirmed by the other two tests.

Now, Your Honor, we also see that across the board her achievement levels have been tested to be extremely low.  With those achievement levels, it is certainly, we would certainly expect her to have deficits in adaptive functioning and Your Honor, the issue of the scores during the developmental period is satisfied by the 1982 scores at Exhibit 21F.  Now we have multiple second impairments here, certainly one would be the back impairment that she has and

the other would be the PTSD that she has. I want to address both of those here very briefly. From a standpoint of PTSD, Your Honor, the record makes clear that Ms. Oldaker had a very difficult childhood and still suffers the effect of that today. She has sought and received treatment from a therapist and a psychiatrist. We see that at Exhibit 15F and 14F the treating sources, Ms. Winfrey and Dr. Ulman [phonetic], the psychiatrist, have indicated that she meets the requirements of 12.06.

Now, Your Honor, in regard to the back impairment, that impairment certainly ties very closely into the 12.05 argument because I have oftentimes seen the argument made that well, this claimant has worked; therefore, we don't think that she meets the requirements of 12.05. And what I would remind the court is that it was perfectly consistent with 12.05 for Ms. Oldaker to have worked prior to her having the back impairment. She was able to perform very simple, routine housekeeping work. However, Your Honor, 12.05 says that you could have the mental impairment, you could have the deficits of adaptive functioning and you could have the deficits in general intellectual functioning. You could have all of those and you are still expected to be able to work until you have that second impairment. And when she got that second impairment of the back problem, that's when she met 12.05 and that's when she because unable to do her past work. That also, Your Honor, exacerbated in our opinion the PTSD condition.

So, Your Honor, we feel that for any one of these conditions, makes her fully unable to work and completely erodes her residual functional capacity; however, we do believe Your Honor, that she meets the requirements of 12.05 and 12.06 and I would remind the court that at Exhibit 18F in regard to her back, this lady has had surgery for a very serious disc herniation and the MRI of May 11th of '06 shows that she continues to have disc herniations at two levels, L5

and S1, L4 and L5.  So she still has herniations.  Your Honor, as we sit here today at two levels in her back.  And that's basically our case, Your Honor.

ALJ          I don't have any records of the first surgery.  When was that?

ATTY        January of 2006 I believe.  I think that's discussed - -

ALJ          The first one?  The first surgery?

CLMT        I only had one.

ATTY        What's that?

CLMT        I've only had one.

ATTY        She says she's only had one, Your Honor.

ALJ          Well how does she have scar tissue from her prior L5, S1 disc surgery as noted in the MRI of November the 23rd of '05?  The record is not clear, counsel, and I'm having difficulty understanding, I'm having difficulty understanding her surgery procedures and her worker's comp awards. I don't know how many times she's been injured for worker's comp purposes.

ATTY        I have not, in the whole history of her employment, Your Honor, I'm not sure.  I know that the issue that brought her here today was a worker's comp injury back in July of '04, which is her alleged onset date in this case.

\*          \*          \*

ALJ          All right but that was after she made application.  I'm trying to figure out where the prior L5, S1 disc surgery and scar tissue came from.

ATTY        Your Honor - -

ALJ          Are you telling me she didn't have a prior surgery?

ATTY        I don't believe she did.  I'm looking at the November 23rd, 2005 MRI and I'm just very quickly reading through it here and I'm not seeing where it references scar tissue.

*               *               *

ALJ         - - prior L5, S1 intervertabrae disc surgery with removal of the bulk of the previously described extrusion.  Now was this, this was in May of '05 so when they're talking about the prior surgery, are they talking about the one that occurred five months prior?

ATTY        That, her surgery occurred in January of 2006, Your Honor.  That was the one done at WBE by Dr. Emory I believe.

ALJ         All right.  I was trying to find, are we not recovered at this point?  Did it do any good?

ATTY        Oh Your Honor, I'm sure she had, I mean she can obviously testify today about that but - -

ALJ         I mean she said she had a problem with a herniated disc when she made application.  She's had surgery where nine months after surgery and you know all of a sudden, I don't see any more record.  What's your argument?

ATTY        Any more record - -

ALJ         She still has a herniated disc or she hasn't had it repaired and it's no longer an issue?

ATTY        Well Your Honor, I think she's had, she has more than, she's today, she had a surgery on the herniated disc that you mentioned in the November 23rd, that was at the L5, S1 level.  Okay, that was where she had the very large herniated disc.  But what I want to remind the court is that, she also and this is confirmed by the November 23rd, 2005 MRI and the May

10

11th, 2006 MRI that she also had a herniated disc at L4/5. And when we, the surgery was done on the L5, S1 disc. But when we look at the May '06, she continues to have a disc herniation at L5, S1 although that condition was, when we look at the MRI, greatly improved, the L4/5 disc herniation is still there and it was never addressed. So - -

\*          \*          \*

ALJ          All right. Also I, your argument with respect to her mental retardation is well taken but first of all, after the age of 18, I have to reconsider her ability to work and her adaptive level of functioning as an adult, not as a child, although it would be indicative of special education and learning disability in school which you know, she obviously had a special education program but I noted that even a psychologist of the claimant that you argued as set forth in Exhibits 13, 14, and 15F don't show a pattern of treatment therapy or counseling during that period of time. I don't know how many times she saw Dr. Winfrey. I see the evaluation on September the 30th of '05 and then all of a sudden a mental assessment in April of '06. But I don't see any treatment records or notes. I find it interesting that the diagnosis of the claimant's treating psychologist is borderline intellectual functioning and not mental retardation. I also note that Morgan, Morgan also indicated borderline intellectual functioning and not mental retardation. Are you telling me that in your opinion the claimant is mentally retarded?

ATTY          Yes, sir. And I could elaborate - -

\*          \*          \*

ALJ          Well Your Honor, that very well may be the case with the treatment that she's receiving. Your Honor, she also began treatment, see, what's happened with Greenbriar Ulman is that he was at Tricounty Health Center and we have records from Tricounty Health

Center and she  has sought treatment from Tricounty Health Center and they haven't, they have addressed this issue of psychological problems for quite some time.  Then Greenbriar Ulman moved and he became a part of what's called Total Life Clinicians.  So Your Honor, I think we have records from both of those sources that, yeah, 19F here is from Total Life Clinicians and that's - -

ALJ          All right.

*               *               *

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q          What is your date of birth?

A          January the 17th of '71.

Q          So how old are you today?

A          Thirty-six.

*               *               *

BY ADMINISTRATIVE LAW JUDGE:

Q          Are you 35 today, Ms. Oldaker, or are you 36?

A          No, I'm 35.

*               *               *

Q          Are you married?

A          Yes.

Q          Do you have any children under 18?

A          Yes.

Q          How many?

A       Two.

                        *               *               *

Q       Do you have a driver's license?

A       Yes.

                        *               *               *

Q       Are you able to drive?

A       Some, yes.

Q       What are your limits?

A       To Weston and back.

Q       Pardon?

A       To Weston and back.

Q       No but I mean is that all the farther you drive?  What limits your driving?  What is it that limits your driving?  You said you drove some.  But what limits your driving?

A       If I go very far, I have my husband to drive me.

                        *               *               *

Q       Did you have any difficulty riding in the car for an hour?

A       Yes.

Q       What problems did you have?

A       My back.

                        *               *               *

Q       How far did you go in school?

A       To the 10th grade.

Q      Were you in special education?

A      Yes.

                 *          *          *

Q      Can you read a newspaper?

A      A little bit.

Q      Can you write your name?

A      Yes.

Q      Can you go to the store and buy something?

A      Yes.

Q      Can you make change?

A      Yes.

Q      Did you have any training after you quit school?

A      No.

Q      Is the only work you've done housekeeping in a motel?

A      Yes.

                 *          *          *

Q      And were you cleaning rooms?

A      Yes.

Q      Making beds?

A      Yes.

Q      Did you do any other work besides motel work?

A      Just at the West, the steakhouse.

Q       All right, when did you work at the steakhouse?

A       After I left the company and it was 2004.

Q       How long did you work at the steakhouse?

A       About seven months.

Q       And what did you do at the steakhouse?

A       Dishwasher.

                        *              *              *

Q       Tell me in your own words what disables you.  Your attorney says it's your back and your nerves.

A       And my reading.

Q       And your reading.  Okay.  When you signed up for disability in 2004, did you have problems with your back?

A       Yes.

Q       Did you have surgery on your back?

A       Yes.

Q       When did you have surgery?

A       2005.  Six.  2006.

Q       Do you remember the month?

A       January.

Q       And counsel said you had more than one disc problem.

A       Yes.

Q       What is your understanding of why they didn't repair all of your discs?

A       Because I don't have that shock absorbency.

Q       Between them?

A       Yes.

Q       So which one did they repair?

A       Well they took it, took that one all the way out.

Q       And you never had any surgery before that?

A       No.

Q       Did you get hurt on the job?

A       Yes.

*            *            *

Q       Did you receive any money from worker's compensation?

A       Yes.

*            *            *

Q       Are you still receiving that today?

A       Yes.

*            *            *

Q       How long have you been receiving that money?

A       Since July, well I quit working on July 23rd.

Q       What year?

A       2004.

Q       And you've been on it ever since?

A       Yes.

Q       Now in addition to your back, do you have any other problems?

A       Other than reading and the depression?

Q       Okay.  Prior to surgery, did you have physical therapy?

A       After surgery I did.

Q       Are you taking any medications now for pain?

A       No, that's why I'm seeing Jeannie.

                          *               *                   *

Q       All right, who is Jeannie?

A       She is the one with Dr. Ulman.

Q       The psychiatrist?  Psychologist?

A       Yes.

Q       But you're not taking any pain medication?

A       No.

Q       How would you describe your back after surgery?

A       It's real, a lot of pain.

Q       But you're not taking any medication?

A       No, they told me I have to learn to deal with it.

                          *               *                   *

Q       Are you still telling me you have pain today?

A       Yes.

Q       Where is your pain?

A       In my low back.

*              *              *

Q       On a scale from 1 to 10, 10 being the worse pain, how would you rate your pain

today?

A       An eight.

                    *              *              *

Q       Who is your treating doctor?

A       Emory Sanford.

                    *              *              *

Q       How often do you see him?

A       I don't see him until October.

Q       When was the last time you saw him?

A       Last month.

Q       Did he do the surgery?

A       Yes.

                    *              *              *

Q       Okay.  Now when did you start seeing Dr. Winfrey and Dr. Ulman?

A       January of 2005.

Q       And what is it that you're treating for?  Depression?

A       Yes.

                    *              *              *

Q       Do you take any medication?

A       Effexor XR,

Q      Is that all?

A      Yes.

Q      Have you taken it the whole time you've been treated by them?

A      Yes.

Q      Do you have any side effects from this medicine?  Does it cause you any

problems?

A      No.

Q      Do the hot baths help you?

A      Yes.

Q      What else do you do?

A      That's about it.

Q      Okay, how far can you walk on level ground?

A      To the mailbox and back.  Like here to the truck.

Q      You have to understand I don't know how far that is unless you tell me.  Do you

have an opinion as to how far it is?

A      About a half a mile.

Q      How long are you able to stand?

A      About 25 minutes.

Q      Can you bend over?

A      No.

Q      Why not?

A      It hurts me.

Q       Can you stoop down?

A       Yes.

Q       Can you squat straight down by bending your knees?

A       Yes.

                        *               *               *

Q       Are you wearing any braces?

A       No.

Q       Are you walking with a cane or a crutch?

A       No.

Q       Are you using a wheelchair?

A       No.

                        *               *               *

Q       Can you make a fist with both of your hands?

A       Yes.

                        *               *               *

Q       How much can you lift today?

A       Bag of sugar.

Q       How much would that weigh?

A       Five pounds.

Q       How about sitting?  How long can you sit?

A       Around an hour.

Q       Does your mental condition affect your memory?

A        Yes.

Q        How does it affect your memory?

A        I forget a lot.

Q        Pardon?

A        I forget a lot of stuff.

                    *               *               *

Q        Are you able to take care of your personal hygiene?

A        Yes.

Q        By that I mean shower, bathe, dress yourself, perform your toileting needs
without help or assistance.

A        Yes.

Q         How long after your surgery were you recuperating or recovering from the
surgery?  How long did it take you before you could get up and about and start taking care of
yourself again?

A        The same day.

Q        So you weren't laid up very long at all?

A        No.

Q        Were you discharged from the hospital on the same day you had the surgery?

A        No, they kept me overnight.

Q        One night?

A        Yes.

                    *               *               *

Q       Do you cook?

A       No.

Q       How do you get your meals?

A       My daughter fixes them.

Q       Does she live with you?

A       Yes.

Q       So your daughter does all the cooking?

A       Uh-huh.

Q       Why don't you cook?

A       I just don't know how.

                              *                    *                    *

Q       What time do you get out of bed in the morning?

A       Seven o'clock.

Q       How do you spend your time?

A       On the computer playing games.

Q       All day?

A       Yes.

                              *                    *                    *

Q       What else do you do during the day?

A       I sleep a lot too.

Q       How many hours a day would you nap?

A       Probably four or five hours.

Q What else do you do during the day?

A That's about it.

Q Well your children are in school, right?

A Yes.

Q What time do you get them off for school?

A Seven o'clock.

Q Do you fix their breakfast?

A No.

Q How do they get their breakfast?

A They fix it themselves.

Q Do you get, do they ride a bus?

A Yes.

Q Do you do any housework?

A I just pick up stuff.

Q You don't vacuum?

A No.

Q Do you do laundry?

A Some.

Q What do you mean by that?

A Just mine and my husband's.

*   *   *

Q How often do you do yours and your husband?

A       About every three or four days.

Q       Any problems doing that?

A       No.

                    *                    *                    *

Q       What are some of the things you've given up that you used to do that you can't do now?

A       Everything.

                    *                    *                    *

Q       What else have you given up?

A       Visiting family.

                    *                    *                    *

Q       Ms. Oldaker, who takes care of the checkbook at your house?

A       I do.

Q       Do you have any problems doing that?

A       Yes.

Q       What kind of problems do you have?

A       I bounce a lot of checks.

Q       What causes you to bounce checks?

A       The adding and subtracting.

                    *                    *                    *

Q       Okay.

ATTY       And Your Honor, I'm going to have to maybe just vouch the record that

it's only about 30 yards from here to the door and her vehicle is parked right by the door so it's not near half a mile.

ALJ        I understood that was the mailbox but maybe I'm wrong.

ATTY        Okay.

BY ATTORNEY:

Q        Is your mailbox about, is it about the same distance from here to your truck or is it farther?

A        It's about the same distance.

                          *                *                *

Q        Can you do anything else with the computer other than the games?

A        No.

Q        Now one thing I want to clear up, you see Dr. Ulman, who is a psychiatrist.

A        Yes.

Q        He gives you your medication?

A        Yes.

Q        You also see a therapist.

A        Yes.

Q        Now that's now Ms. Winfrey though, right?

A        Right.

Q        Her name is Halahan?

A        O'Halaran.

Q        O'Halaran.

A       Yes.

Q       Okay, and she's a therapist?

A       Yes.

Q       Do you talk to her about your problem?

A       Yes.

                    *           *           *

Q       Okay.  Now you mentioned earlier that you had recovered the same day of your

surgery?

A       I was up and around the same day.

Q       Okay.  Did you have any limitations on that day?

A       He just said take it easy.

Q       Okay.  I mean, could you do the same things that you did before you got hurt?

A       No.

Q       Did your back hurt?

A       Yes.

Q       Does it hurt today?

A       Yes.

Q       What's the, did surgery help you or did you remain the same or did you get

worse?

A       It remains the same.

Q       Did you get any benefit from surgery?

A       No.

*    *    *

Q Okay.  Do you have any problems with concentration or focusing on what you're doing?

A Yes.

Q Can you tell me about that?

A It's not very long.

*    *    *

Q Okay.  What kind of hobbies did you used to have?

A I used to go mow and clean the house and spend time with the kids and I can't do none of that now.

Q Okay.  After you hurt your back, the depression and nerves that you talk about, did that get better, worse, or stay the same?

A It got worser.

*    *    *

Q Would you classify the work that she's done since she last worked in July of '04?

A Yes, Your Honor.  The claimant previously was employed as a light housekeeper at four motels.  That's classified at the light level, unskilled.  She also indicated she worked seven months as a dishwasher and that job was classified at the medium level, unskilled.

Q It appears that we have a claimant between the ages of 33 and 35.  She has limited education, completed only the 10th grade.  And I want you to consider that she functions at the borderline level of intellectual function in the past relevant work that you've identified.  The state agency in this case has indicated that such an individual as the claimant could perform the

27

light exertional level of work activity as set forth in the record in Exhibit 6F.  That is, lift 20 pounds occasionally, 10 pounds frequently.  Standing and walking could be accomplished six hours in an eight-hour day with normal breaks, sitting six hours in an eight-hour day with normal breaks.  The climbing, balancing, stooping, kneeling, crouching, and crawling could be accomplished at the level of only occasionally.  With respect to the environmental type limitations, such an individual should avoid concentrated exposure to full body vibration, as well as the hazards of moving plant machinery and unprotected heights.  But first of all, with that hypothetical, would such an individual be able to do any of the past work that the claimant performed at either the motel for this addition?

A       Yes, Your Honor.  The claimant could have performed the light housekeeping job at the motel.  But not the dishwashing job.

Q       All right.  If an individual has in addition to the light hypothetical that I gave you, the need to be limited to just simple, routine type activity, by that I mean no more than one or two type step type work, and the need to refrain from any fast paced production type quota demand in any work activity.  If that were added to the hypothetical of light, would such an individual still be able to do any of the work that you indicated that she could do in response to the light hypothetical?

A       Yes, Your Honor.  The claimant could perform her previous employment.  I think I indicated that.  Or any residual occupations.  Your Honor?

*             *             *

Q       Assume, then I would like for you to assume that the, if I would consider that such an individual could not do her past relevant work at the light level with the mental

limitations, would there be other jobs at light that such an individual could perform with that entire hypothetical?

A       Yes, I need a moment.

Q       All right.

A       I'm ready, Your Honor.

Q       All right, sir, you may proceed.

A       Your Honor, considering your hypothetical, it would be my testimony the jobs would exist at the light level are consistent with that hypo.  At the light level unskilled, the position of the cafeteria worker for which there are at least 400,000 jobs in the national economy and at least 1,400 in the state of West Virginia.  Also, at the light level, the position of a folder in laundry environment industry.  At least 100,000 jobs in the national economy and at least 500 in the state of West Virginia, consistent with the DOT.

Q       How many were in West Virginia?  I'm sorry, I didn't - -

A       Five hundred, 500 for the folder.

Q       Thank you.  Now just for the purposes of the record, assume a sedentary hypothetical with the same postural limitations to occasional as we previously discussed, incapable of balancing, stooping, kneeling, crouching, crawling and the mental limitation.

A       One question, Your Honor, for clarification.  You indicated as the last part of that hypothetical, did you indicate no production standards, no - -

Q       I indicated that such an individual should not be involved in any fast-paced production quota-type work where [INAUDIBLE] for compensation is based on fast performance rather than just being able to work.

A       I thought that's what you said.  I just wanted to get it confirmed, Your Honor.  In that event, Your Honor, even though there are assembly sedentary jobs available in the economy, they do have production standards or requirements in order to maintain employment so my response is that there would be no jobs.

Q       At sedentary?

A       Yes.

Q       If the claimant's testimony were considered completely credible and supported by our medical evidence of record, so as to preclude even the light work that she did in the past or the jobs that you identified at the light level in response to the hypothetical and her ability to maintain attention and concentration to do even simple unskilled work would rise to the level of marked, not only because of her pain and discomfort but because of her mental condition.  It precludes the ability to concentrate.  If that would be the case, would there be any jobs an individual could perform?

A       No, Your Honor.  There would be jobs.

*               *               *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       Mr. Panza, is there any provision for laying down outside of the normal lunch periods and break periods?

A       For what period of time?

Q       Well I guess my first question is, is there, is that allowed at all in the types of work that we've been discussing here today outside of the lunch period and in the morning and afternoon break?

A       Here again, I think you need to give me some time, but, if somebody went into the bathroom and laid down for a minute or two, I'm sure that wouldn't interfere with the individual's employment activities but - -

Q       Okay, fair enough.  If they were going to lay down for an hour too throughout the day, would that be any problem?

A       Yes it would be.  That would void any employment activity.

Q       Okay.

A       Any jobs.

Q       Now Mr. Panza, if you had someone, if you had a hypothetical individual who had a poor, and poor is defined as the ability to function in this area seriously limited, but not precluded, a poor ability to relate to coworkers, deal with the public, deal with work stresses, function independently, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situation, and a poor ability to demonstrate reliability, would that, how would that set of limitations affect the person's ability to do the types of jobs that we've been talking about here today?

A       I think a combination of all those employment deficits that you alluded to at the poor category would  not permit the individual to perform at an accessible, acceptable type of employment for employers so consequently there would be no jobs.

E.       Lifestyle Evidence

The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how claimant's alleged impairments affect her daily life:

- Watches tv (Tr. 89)

- Tries to clean the house (Tr. 89)

- Fixes meals (Tr. 89)

- Takes care of the children (Tr. 90)

- Does laundry (Tr. 90)

- Handles personal care, but with pain (Tr. 90)

- Gets mail and takes children to the doctor (Tr. 92)

- Is able to drive (Tr. 92)

- Shops five times per month (Tr. 92)

- Is able to pay bills, count change and handle bank accounts (Tr. 192)

- Exercises (Tr. 93)

- Takes no medication for the pain claiming it doesn't help (Tr. 98)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ erred because he failed to find her condition met the requirements of Listing 12.05(c).  Claimant also contends the ALJ erred by failing to properly consider the treating source opinions.  Lastly, Claimant contends the ALJ failed to include all of her limitations in the residual functional capacity ("RFC") finding.

Commissioner maintains that substantial evidence supports the ALJ's determination that Claimant did not meet or equal Listing 12.05(c).  Commissioner also argues that substantial evidence supports the ALJ's weighing of the medical sources and the RFC assessment.

B.    <u>The Standards</u>.

1.     <u>Summary Judgment</u>.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.     <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.     <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.     <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

33

404.1508, 416.908.

5.     <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.     <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is

disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10. <u>Social Security - Residual Functional Capacity</u>. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id</u>. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. <u>Id</u>. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. <u>Id</u>. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. <u>Id</u>. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. <u>Id</u>

C. <u>Discussion</u>

<u>1. Listing 12.05(c)</u>

Claimant contends that the ALJ erred because he failed to find that Claimant met the requirements of Listing 12.05(c). Specifically, Claimant contends that the ALJ summarily rejected the notion that her condition met the listing and in so doing ignored undeniable objective evidence and misrepresented the nature of the evidence in the record. Commissioner countered that the ALJ properly found that Claimant has not shown that she meets the requirements for disability. Specifically, Commissioner argues that the ALJ's decision is supported because the evidence showed Claimant functioned in the borderline intellectual level and Claimant failed to prove that she had the requisite deficits in adaptive functioning initially manifested during the developmental period as required by the regulations.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id.

The issue is whether there is substantial evidence to support the ALJ's finding that Claimant did not meet the listed impairment for mental retardation. The listing of 12.05 of 20 C.F.R. Part 404 Subpt. P., Appendix 1 is as follows:

> Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period; i.e., the evidence demonstrates or supports the onset of the impairment before age 22...
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .

C.  A valid verbal, performance, or full scale IQ of 60 to 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function...

Moreover, 20 C.F.R. Part 404 Subpt. P., App. 1 §12.00(D)(6)(c) provides, in relevant

part:

...In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Weschler series, we use the lowest in conjunction with 12.05.[6]

To meet this listing, Claimant was required to prove she met all the criteria of the listing.

Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  Meeting only some criteria for a listing, "no

matter how severely, does not qualify."  Zebley, 493 U.S. at 530.

It is clear that § 12.05 imposes a three-part test; all three elements must be met in order

for a claimant to satisfy the requirements of Listing 12.05 and be considered mentally retarded.

First, the Claimant must show "onset of the impairment before age 22."  Part two is a two-prong

test requiring a valid IQ score of between 60 and 70 and a physical or other impairment imposing

additional and significant work-related limitation of function.  "Alongside the two requirements

in 12.05(C), the introductory paragraph of section 12.05 creates an additional element required to

meet the listing for mental retardation."  Thomas v. Astrue, 2008 U.S. Dist. LEXIS 41150, 42

(W.D. Va. May 23, 2008).  See Smith v. Barnhart, 2005 U.S. Dist. LEXIS 5975, 10 (W.D. Va.

Apr. 8, 2005) (citing Barnes v. Barnhart, 116 Fed. Appx. 934, 2004 WL 2681465, 4 (10th Cir.

2004)).  "The capsule definition makes it clear that mental retardation is a life-long, and not

acquired, disability.  Thus, to qualify as disabled under this listing, a plaintiff must first

_____

[6]  See also Kennedy v. Heckler, 739 F.2d 168 (4th Cir. 1984)(the regulations mandate when a single IQ test produces multiple scores, the lowest score is to be used in conjunction with §12.05).

demonstrate that he has had deficits in adaptive functioning that began during childhood." <u>Smith</u> at 10.

The ALJ noted that the Claimant achieved a valid IQ score between 60 and 70. (Tr. 26). Therefore, that prong of the test is not at issue. The ALJ found there to be no evidence that the claimant's significant subaverage intellectual functioning manifested prior to age 22. He also found no evidence of any deficits in adaptive behavior. (Tr. 26). The ALJ placed particular emphasis on the fact that Claimant has been able to work at the substantial gainful activity level for several years, take care of her home and family, and generally adapt to her environment and society. As indicated above, in order to meet the listing, Claimant would have to have met both of these requirements.

Claimant insists the evidence shows subaverage general intellectual functioning manifested prior to her reaching the age of 22. She points to a WISC-R test administered while she was in elementary school which showed a valid IQ score of 69. (Tr. 351-55). She claims this IQ score is in the mentally retarded range and therefore qualifies as "subaverage general intellectual functioning." Claimant cites no other evidence to support her contention that subaverage general intellectual functioning manifested during the developmental period.

The Commissioner maintains that substantial evidence supports the ALJ's conclusion that Claimant did not have significant deficits in adaptive functioning initially manifested during the developmental period. The Court agrees with Commissioner on this issue.

Standing alone, a valid IQ score of 69 while Claimant was still in elementary school is not enough to indicate subaverage general intellectual functioning necessary for Claimant to meet her burden. Furthermore, Claimant received an "A" in English and Mathematics in 1987.

(Tr. 154).  Claimant's scores on the WRAT show she possessed basic arithmetic knowledge.

She did, however, have below average reading skills.  (Tr.  354).  Whether Claimant is mentally

retarded is not for this Court to say.  However, substantial evidence supports the ALJ's

determination that Claimant failed to show subaverage intellectual functioning prior to age 22.

Claimant also argues that she meets the test regarding deficits in adaptive functioning.

One of the essential features of mental retardation is significant deficits in adaptive functioning.

20 C.F.R. pt. 404 subpt. P, app. 1, § 12.05.  Mental retardation would not be diagnosed in an

individual with an IQ below 70 absent significant deficits or impairments in adaptive

functioning.  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 37, 39-40 (4th ed.

1994).  Adaptive functioning refers to how effectively an individual is able to cope with common

life demands and how well he meets the standards of personal independence expected of

someone in his particular age group, socio-cultural background, and community setting.  Id. at

40.

The ALJ found "[t]here is no evidence of any deficits in adaptive behavior."  (Tr. 26).

As Claimant argues, this is simply not true.  At the hearing, in response to a question regarding

cooking, Claimant testified, "I just don't know how [to cook]."  (Tr. 421-22).  She also testified

that she bounces "a lot of checks"" because of 'the adding and subtracting."  (Tr. 427).  This

evidence is indicative of deficits in adaptive functioning.  It may well be that substantial

evidence supports the ALJ's ultimate conclusion that Claimant does not meet Listing 12.05(c),

but it is for the ALJ, and not this Court, to weigh the evidence in the record.  However, the fact

that the ALJ has not weighed this evidence is not cause for remand.  Because the Court found

above that the ALJ's determination that the Claimant did not meet her burden of showing

manifestation of subaverage intellectual functioning prior to age 22 was supported by substantial evidence, remand would not change the outcome.[7]  Therefore, the error on the part of the ALJ to not weigh the evidence outlining Claimant's deficits in adaptive functioning was harmless.[8]

2.  Treating Source Opinions

A treating physician's opinion will be entitled to controlling weight under some circumstances.  The opinion must be (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 416.972(d)(2).  A treating physician's opinion will be disregarded if persuasive contrary evidence exists.  Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984).  To decide whether an impairment is adequately supported by medical evidence, the Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); 20 C.F.R. § 404.1508; Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).  Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and

---

[7] At every stage of the proceeding, the Court must disregard all errors and defects that do not affect any party's substantial rights.  Fed. R. Civ. P. 61.  See also Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error doctrine in the context of a social security case).

[8] Claimant goes on to argue another element, "second impairment."  Claimant is correct that 12.05(c) requires a showing of a "physical or other mental impairment..."  The ALJ found the following severe impairments: herniated disc of the lumbar spine status post discectomy, borderline intellectual functioning, adjustment disorder with depressed mood and post traumatic stress disorder.  (Tr. 25).

(5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). See also Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006). Regardless of a physician's opinion, the ultimate legal determination of Claimant's impairments remains with the Commissioner. 20 C.F.R. § 404.1527(d)(2); (e)(2); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). Furthermore, an opinion regarding a claimant's RFC is "never entitled to controlling weight or special significance. 20 C.F.R. § 416.927(d)(2),(3) (2008). The ALJ's findings will be upheld as long as substantial evidence supports them. Hays, 907 F.2d at 1456.

Claimant argues that the ALJ summarily dismissed the opinions of her treating psychologists, Greenbrier Almond, M.D. and Joy Butcher-Winfree in violation of the five-step Hines analysis outlined above.[9]

Claimant's argument is without merit. The ALJ noted the opinions of both Dr. Almond and Ms. Butcher-Winfree. Just as this Court did above, the ALJ summarized the opinions and medical evidence submitted by both individuals. As for Ms. Butcher-Winfree, the ALJ was not sure whether she could be considered a treating physician because "there are no treatment records to support an ongoing treating relationship." (Tr. 29). This Court agrees. It appears that Ms. Butcher-Winfree evaluated Claimant on only two occasions, 9/30/2005 and 10/6/2005. She reviewed the results of the standardized tests given by Mr. Morgan and diagnosed Claimant with PTSD and borderline intellectual functioning. (Tr. 287). She found marked difficulties in maintaining social functioning and maintaining concentration, persistence or pace. Furthermore,

---

[9] Claimant also identifies Jean M. O'Halloran, MSW/LICSW as a "treating counselor" and cites two letters written by Ms. Ohalloran. Claimant contends these letters "explain the course of [claimant's] treatment." Cl.'s Br. at 8. The second of these letters, dated May 24, 2007 and described by the Court above, was submitted after the ALJ's decision. The ALJ referred to and considered the first letter at Tr. 29. Other than these letters, there is no other medical evidence of record submitted by Ms. O'Halloran.

the ALJ found that even if Ms. Butcher-Winfree were to be considered a treating physician, her opinion was not consistent with other substantial evidence. (Tr. 29). The ALJ's consideration of Ms. Butcher-Winfree's opinion was proper in light of the <u>Hines</u> test.

Claimant argues that the ALJ found no evidence from Dr. Almond exists. The ALJ found "a lack of treatment notes" from Dr. Almond. (Tr. 29). The Undersigned agrees with the ALJ that the record lacks treatment notes from. Included in the record is a letter, written by Dr. Almond to Claimant's attorney on July 22, 2006. In the letter, he indicated Claimant participated in psychiatric evaluations in March, April, May and June of 2006. He diagnosed Claimant with Axis I - depression secondary to back pain. He indicated her global assessment of function is 50, which is in the serious range of debility. (Tr. 334).

Prior to that, Dr. Almond saw Claimant from October to December, 2005. On 12/20/05, Dr. Almond reported that Claimant was improving in her PTSD symptoms and is less anxious and depressed. (Tr. 356). The ALJ referred to the only evidence submitted by Dr. Almond and properly gave his opinion limited weight. (Tr. 29). Dr. Almond's opinion, like Ms. Butcher-Winfree's, were not supported by even their own assessments, let alone Claimant's admitted activities of daily living. The ALJ stated, Claimant "is independent in all activities of daily living. She is able to do household cleaning and take care of her two children and a cat. While the claimant's impairments are severe in that they have more than a minimal effect on her ability to function, they are not totally disabling and do not preclude the performance of all substantial gainful activity."

The ALJ properly weighed all of the evidence as well as the physicians' opinions and determined that the opinions of Dr. Almond and Ms. Butcher-Winfree were not entitled to

controlling weight. In light of the entire record, the Court finds the ALJ's analysis to be proper and supported by substantial evidence.

### 3. RFC

Claimant contends the ALJ erred by failing to include all of her limitations in his RFC finding. Claimant finds it "shocking" that the ALJ's only reference to her alleged mental retardation in the RFC assessment was that she could not do skilled or semi-skilled work.

Commissioner argues that the ALJ properly found that Claimant has the RFC to perform a modified range of light, unskilled work. (Tr. 26).

A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. Id.

Here, the ALJ found the Claimant had the following RFC:

> to lift and/or carry up to 20 pounds occasionally and ten pounds frequently; stand and/or walk six hours overall in an eight hour workday; sit the entire workday and is unlimited to frequent pushing and/or pulling with her upper and lower extremities bilaterally. Due to medication side-effects, pain and the mental impairment, she should avoid complex and detailed tasks and instructions as found in

skilled and semi-skilled work, but has an unlimited ability to follow and complete simple tasks and instructions. She should avoid concentrated exposure to vibrations, moving/dangerous machinery and unprotected heights. She can climb, balance, stoop, squat and kneel occasionally. (Tr. 26).

This Court cannot say that the ALJ's RFC finding was not supported by substantial evidence, nor can it say that it fails to include all of Claimant's limitations. Claimant argues that the RFC finding contains no mental limitations. More specifically, Claimant argues that the ALJ's mention of skilled or semi-skilled work is not relevant to her claim. Furthermore, Claimant interprets the ALJ's saying she has "an unlimited ability to follow and complete simple tasks and instructions" to mean that she has no mental limitations whatsoever.

Claimant's arguments are without merit. First, the ALJ could not have been more clear that Claimant does, in fact, have a mental impairment. He says as much at step two of his analysis. More to the point, he says so in his RFC assessment. (Tr. 26). The ALJ explains that Claimant's mental impairment would preclude her from skilled or semi-skilled work, but would not prevent her from performing unskilled work of the degree and nature similar to her past relevant work as a housekeeper. Furthermore, substantial evidence supports the ALJ's finding that Claimant has an unlimited ability to follow and complete simple tasks and instructions. The Court disagrees with Claimant that by making this finding the ALJ is basically saying she has no mental limitations. In a general sense, the existence of a mental impairment does not necessarily render that individual incapable of following and completing simple tasks and instructions. The evidence of record indicates Claimant has a mental impairment. The ALJ makes specific reference to her "borderline intellectual functioning, adjustment disorder with depressed mood and post traumatic stress disorder." (Tr. 25). Therefore, Claimant's contention that the ALJ

simply ignored her mental limitations is simply not true. Finally, substantial evidence supports the ALJ's finding that, despite Claimant's mental limitations, she has the ability to perform unskilled work.

Her initial application alleged back problems beginning on July 4, 2004. She made no mention of any mental issues. Her back injury is not at issue before this Court, only her alleged mental impairment. Any mental issues appear to stem from a traumatic event occurring over a number of years during Claimant's childhood. She was able to perform substantial gainful activity as a housekeeper for many years until she injured her back in 2004. Furthermore, as the ALJ noted, Claimant's activities of daily living do not support a finding of disability. The ALJ's RFC was supported by substantial evidence.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED**. Substantial evidence supported the ALJ's finding that Claimant failed to meet Listing 12.05(c) because Claimant failed to meet each element of the listing, specifically, substantial evidence supported the ALJ's finding that subaverage intellectual functioning did not manifest prior to Claimant reaching age 22. Furthermore, the ALJ properly considered the opinions of all Claimant's treating sources and finally, the ALJ made a proper RFC finding.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written

objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 14, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE